REFINERY EQUIPMENT, INC., v. WICK-
ETT REFINING CO.

No. 11647.

Circuit Court of Appeals, Fifth Circuit.
Jan. 13, 1947.

Irvine E. Ungerman, of Tulsa, Okl., and Travers Crumpton, of Fort Stockton, Tex., for appellant.

R. B. Rawlins, of Monahans, Tex., for appellee.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

Appellant as plaintiff sued appellee for $3500 as the purchase price of a bubble tower sold and delivered about July 28, 1944. Appellee admitted purchasing the bubble tower and its delivery, but alleged that it was guaranteed to be in good mechanical condition and capable of use for the purpose for which it was designed; and that on arrival it was discovered not safely usable and was rejected. There was a counter-claim for $497.34 lost in freight charges on the tower and in building an unused foundation for it. The judge, sitting without a jury, found that the bubble tower was guaranteed as above stated but when shipped to defendant it was unfit for use as such. He found, too, that plaintiff in its catalogue had made representations as to its serviceability and condition as an inducement to the purchase, and that when shipped it was not in the condition described in the catalogue and was unserviceable for the purpose for which it was designed and purchased. He found that the only examination or inspection of the tower by defendant before shipment was to secure measurements to erect a foundation for it, and was not an acceptance of it. It was concluded as matter of law that there was an implied warranty that the tower was suitable for the purpose intended, which purpose was well known to plaintiff; and that the representations in the catalogue amounted to a warranty; which being broken, the rejection of the tower was justified and no recovery of the price could be had; also that the cost of the foundation and the freight should be recovered. Judgment was given accordingly.

The appellant here contends that the findings of fact and the conclusions of law are each clearly erroneous; and that there was error in admitting evidence inconsistent with the written contract of purchase, towit: the representation in the catalogue as to reconditioning and testing the equipment offered for sale, and the oral negotiations prior to the execution of the contract, and as to expenditures about the foundation and freight; and as to the condition of the tower after its delivery.

The proof discloses that appellant was a dealer in second-hand machinery and equipment with headquarters at Tulsa, Oklahoma, and issued a loose-leaf catalogue of what it had for sale from time to time. Among the things listed in July, 1944, was the bubble tower in question, part of the equipment formerly used by Lynch Refining Company in making gasolene by a fractionating process at Kilgore, Texas. The bubble tower stood connected up as it was when Lynch Refining Company ceased operations about Jan. 1, 1943, and had not been used since. It was of boiler construction, made of steel plates originally $7/16$ of an inch thick, 5 feet in diameter and fifty feet high, with 18 trays fastened across it inside, a manhole at top and bottom, and pipe connections for inlet and outlet pipes. Its operation is not described, but it evidently is vapor tight and operates under pressure. The vice-president of appellee, desiring a bubble

tower for use in appellee's refinery at Wickett, Texas, saw this one described in appellant's catalogue, and by 'phone negotiated with appellant's secretary for its purchase, each of them having a copy of the catalogue and referring to it. They agreed on a price and other details and that a written purchase order should be sent by appellant. The order was sent in duplicate, signed by appellant on July 18, 1944, and concluding: "Please sign and return blue copy with invoice." Appellant did sign its acceptance on the duplicate and returned it to appellee. There is conflict as to whether or not appellant's secretary orally guaranteed the tower, and whether appellee was to send its representative to Kilgore to examine and accept the bubble tower before delivery, or merely to see if the openings on it would work with appellee's machinery with which it was to be connected. The judge resolved these conflicts in favor of the appellee, and he having seen and heard the witnesses testify we cannot say these fact conclusions were clearly erroneous.

▇▇▇ What effect in law do they have? We are of opinion that the purchase order and its acceptance constitute a written contract. The order dated July 18, 1944, is addressed to Refinery Equipment, Inc., Tulsa, Oklahoma, and directs shipment to Wickett Refining Co., Wickett, Texas, rush, Terms f. o. b. Car Kilgore, Texas, of "One Bubble Tower, 5' I.D.[1] x 50' High, 7/16 Shell Thickness, as described in Refinery Equipment, Inc. Item No. II, Towers and Vessels, $3500. All sales contracts and agreements are contingent upon strikes, governmental action, accidents, or other occurrence beyond our control." It is signed Wickett Refining Co., and "accepted", with date and signature of Refinery Equipment, Inc. This evidences a complete and formal written contract. The testimony of the officers who made it, and the surrounding circumstances make it clear that the words "as described in Refinery Equipment, Inc. Item No. II, Towers and Vessels", is a reference to appellee's catalogue, wherein Item No. II a bubble tower of the stated specifications is more elab-

orately described. We conclude therefore that this express reference to the catalogue makes it a part of the contract. There is imported into the contract not only the description and representations contained in Item II, but the more general statements of the catalogue which are made concerning all the items it offers. The first page, over the signature of Refinery Equipment, Inc., contains this: "At your command! Top quality equipment and supplies—available stocks—Service—Savings—all at your command. * * * Large * * * stocks of *reconditioned refining equipment* * * * are carried for immediate delivery. * * * *Our engineers supervise the reconditioning and testing of each piece of equipment to assure satisfactory performance.*" The first part quoted is mere sales talk. The part italicised is a plain assertion of the fact of reconditioning and testing, or a plain promise thereof, expressly made applicable to each piece of the equipment offered. It is a part of this contract. 46 Am.Jur., Sales, §§ 314, 325, 326.

▇▇▇ There being a written contract complete on its face, appellant is right in its contention that previous parol negotiations are merged into it, and cannot add to its terms. 46 Am.Jur., Sales, § 281. The equipment contracted for being avowedly second-hand warranties of condition are not easily or usually to be implied, but an express affirmation or promise about it must be made good. Id. § 327. We reject therefore the oral guarantee found to be a fact, but hold the catalogue promise of reconditioning and testing under an engineer's supervision, and the description as having a shell 7/16 inches thick are to be fulfilled as conditions or warranties. Id. §§ 315, 325. The conflict of evidence as to whether the buyer agreed to make his own inspection also becomes unimportant, because a part of the oral negotiations. Mere opportunity to inspect will not expunge the terms of the written contract. Id. § 330.

▇▇▇ But some sort of inspection was in fact made afterwards by a representative of the buyer, and it is contended he learned the exact condition of the bubble tower, and the buyer did not rely on the catalogue

---

[1] Inside diameter.

description and promises but on this inspection. The tower was standing in its place at Kilgore, was covered with insulation, save a few spots. Looking into the manholes the representative would not be able to see up or down further than the lower and upper trays. The testimony is positive that the examination was only authorized and made for the purpose of seeing if the inlet and outlet openings were so placed as to be connectible with the buyer's refinery equipment; and that no effort was made to make a thorough inspection as to condition and safety as a basis of acceptance of it. The judge believed this testimony. His statement in the fact findings that the purpose was to get measurements for the foundation seems to be an inadvertence. The important finding is that there was not an inspection to ascertain condition. The warranties of the contract were not thereby waived or superseded.

The bubble tower afterwards was stripped of its insulation, taken down and promptly shipped to Wickett by appellant, arriving August 2nd. It was unloaded and laid on the ground by appellee's men, near the foundation which it was building for it. It is testified by each crew that it was not dropped in loading or unloading, but two depressions in the shell were noticed after it was put on the ground, testified to have been made by the weight of the tower where it rested on the bolsters of the trucks which hauled it. Eight of the trays were found disarranged and twisted near its bottom, at first believed due to damage in transit, and complained of as such, with an inquiry by buyer to seller whether new trays could be had. None could be procured. More serious trouble with the tower was then found and it was rejected and the seller promptly notified. An employee of the seller who had been in charge of the equipment at Kilgore and had taken the tower down and loaded it was sent to Wickett to inspect it about July 1, 1945. He testified he found it lying at the prepared foundation, saw the two dents in the tower, sunk in about ¾ of an inch, and eight of the trays fallen down. He did not go inside the tower but made a test outside over the shell with a hammer

and found no weak place, but did not take any trays out, and spent only forty minutes there, though he says three hours would be required for a thorough test. He never had removed any trays and inspected the inside of the tower since appellant bought the equipment of Lynch Refining Company in January, 1943, and so far as he knew it was in the same condition as Lynch left it. He testified a government inspector had in January, 1943, calipered it as 7/16 inch and had made no suggestions; but the inspector was not a witness. He said also that the tower had not been used since appellant bought the Lynch equipment and it was in usable condition then. Appellee's vice-president testified that he in December, 1944, (a letter from him dated Oct. 30, 1944, to appellant states it was in September), inspected the tower from the outside with a hammer and found several weak places in the shell. He had never heard that the tower had been damaged in unloading or on the railroad. He had never seen the tower before buying it, and knew nothing about it except from the catalogue. His company was at the time of trial still using a bubble tower intalled in 1927, having relined it after rejecting the one in controversy. Appellee had the tower fully inspected by a competent engineer in August, 1945. This engineer testified in part: "I examined the thickness. I found out in several places the vessel had corroded to a point that it was less than a quarter of an inch thick. The thinnest place I found was 19/100 of an inch. * * * The bottom eight fractionating trays were badly distorted and torn to a point where it would be impossible to perform any fractionation whatever. I found that the metal in places in those trays was stovepipe thin. To have placed it in operation * * * most of the inside would have to have been replaced to put it in workable condition. I wondered what could have caused the condition of the trays, and as a matter of opinion it would appear to have been a minor explosion at the bottom of the tower. It would not have to be great, because the metal of the trays was so thin it would not have been difficult to distort them." He did not think it could

have happened in transit or loading or unloading. He specified five places on the shell less than a quarter of an inch thick and two $^{19}/_{100}$, and several less than $^4/_{10}$. As throwing light on the interior corrosion of the tower there is testimony of appellant's secretary that a bubble tower would operate on "Sweet crude" (oil) ten or twelve years, but if run on "Sour crude" it would eat it out in six months' or a year's time. He said Lynch Refining Company, from their records, were running on Sweet crude, but the records were not produced nor any witness who knew. On this testimony the judge was authorized to conclude that at the time of its delivery the bubble tower shell was not $^7/_{16}$ inches thick, and that the tower had not been reconditioned and tested under an engineer's supervision as promised in the catalogue, and was "in an unserviceable condition, unusable for the purpose designed and for which purchased by defendant."

 As a matter of law he concluded that because of the catalogue warranty and its breach there could be no recovery by plaintiff of the purchase price or any sum. In many jurisdictions and under the Uniform Sales Act a breach of warranty as to quality or condition justifies the purchaser in rescinding the sale after the delivery of the thing sold. 46 Am.Jur., Sales, §§ 758, 760. But in Texas, beginning with Wright v. Davenport, 44 Tex. 164, through Chastain v. Gilbert, Tex. Civ.App., 145 S.W.2d 938, the law has been as thus summarized in 37 Tex.Jur., Sec. 240: "When there is no fraud, and the warranty goes to the fitness of the article, and it proves wholly unsuitable, or to the identity of the article, and it proves another thing from that for which it was sold it may be returned. * * * But if the warranty goes to the degree of fitness or to quality, and it proves to be of an inferior quality or fitness the goods cannot be returned. * * * Thus if a machine is sold for a particular purpose, and it will perform none of the functions, it may be returned; but if it only performs them badly the remedy is by action for damages. The fact that some parts may be defective, or that it does not perform as guaranteed, does not warrant a rescission of the contract so long as the machine is not wholly worthless." In the present case fraud has not been made an issue. There is no finding that the bubble tower was wholly worthless. Appellee's inspection engineer testified that with the distorted trays it would not perform as a fractionation tower, but he said it could have been put into good condition for refinery operation at a cost of from $1500 to $2000. Appellee's vice-president testified it was worth something for storage purposes, but he did not say how much. The testimony is meager and vague, but we understand it to tend to prove that relining would have remedied the thin places in the shell, and new trays or perhaps repair of the old ones would have corrected that fault. We think additional evidence should be received and better findings made on the question whether the tower could be rejected at the time it was rejected; and if not, what amount should be allowed against the purchase price by reason of the breach of warranty.

For this cause the judgment is set aside and the cause remanded to the district court for further proceedings consistent with this opinion.