**UNITED STATES of America,**
**Plaintiff,**

**v.**

**AERODEX, INC., Raymond M. Tonks,**
**Frank J. Crawford, and Hermann**
**Waker, Jr., Defendants.**

**Civ. No. 68–1165.**

United States District Court,
S. D. Florida.

Oct. 30, 1970.

L. Stanley Paige, Chief, Frauds Section, U.S. Dept. of Justice, for plaintiff.

Walton, Lantaff, Schroeder, Carson & Wahl, Walters, Moore & Costanzo, Miami, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CABOT, District Judge.

Final hearing in this cause was held before the court without a jury for eight trial days beginning on February 16, 1970.

During the trial the court reserved ruling on the admissibility of certain exhibits and on certain motions and directed the parties to submit memorandum briefs thereon. The court has considered the briefs and is otherwise advised in the premises, and it is ordered that:

1. Defendants' Exhibit 19 for identification, defendants' Exhibits 26A–F for identification, and the Government's Exhibit 119 for identification are received in evidence.

2. Government's post-trial motion that its Exhibit 97 for identification, which the court earlier ruled was not admissible, be received in evidence, is denied, since it was not included on the pretrial stipulation entered into between the parties.

3. The court takes notice of Parts 1 and 2 of Chapter 4, and Chapter 13 of Secretary of the Navy Instructions concerning "Disposal of Navy and Marine Corps Records."

4. The defendants' separate motions to dismiss made at the close of the Government's case in chief and at the close of all the evidence are denied.

The court has considered the testimony, exhibits, and counsel's extensive post-trial written submissions, and makes the following

## FINDINGS OF FACT

1. This is a civil action brought by the United States of America under the provisions of Sections 3490 and 5438, Revised Statutes, Title 31 U.S.C. § 231, and 28 U.S.C. § 1345. Jurisdiction of

this court is conferred by Section 3491, Revised Statutes, Title 31 U.S.C. § 232, and 28 U.S.C. § 1345.

2. At all relevant times Aerodex, Inc., was a corporation organized and existing under the laws of the State of Delaware; Raymond M. Tonks was president and general manager, Frank J. Crawford was vice-president in charge of the commercial division, and Hermann Waker, Jr., was manager of the commercial division of Aerodex, Inc.

3. At such times none of the defendants was a person in the military or naval forces of the United States or in the militia called into or actually employed in the Service of the United States.

4. The Department of the Navy of the United States entered into a certain contract with defendant Aerodex, Inc., dated October 6, 1962, according to the terms of which defendant corporation was to supply certain parts for designated aircraft engines for a total price of $254,005.00. The contract provided in part for the furnishing by Aerodex, Inc., of 300 Wright Aeronautical Division Master Rod Bearings for the Curtiss-Wright R1820 engines to be in accordance with Wright Aeronautical Division of Curtiss-Wright Corporation Part Number 171815 at a cost of $90.00 each, for a total of $27,000.00.

5. The contract provided that the bearings were to be identified by applicable Curtiss-Wright Corporation, Wright Aeronautical Division, part number, and must conform to the requirements of the respective drawing for said article, and that all bearings must be in new, unused condition.

6. The contract also provided for preliminary inspection of the bearings at the plant of Aerodex, Inc., in Miami, and for a "100% final inspection" by the Overhaul and Repair Shop of the consignee, Naval Air Station, Jacksonville, Florida.

7. Defendant Frank J. Crawford, on September 18, 1962, prepared and submitted a bid to the Navy Aviation Supply Office for 300 bearings Part Number (P/N) 171815 at $90.00 each, and on September 20, 1962, informed the Aviation Supply Office that the bearings were new and unused.

8. Defendants purchased 300 bearings P/N 117971 and 117971Y10, and caused each of them to be reworked by replacing the lead-tin overlay on the inside diameter. The bearing was then re-identified as P/N 171815.

9. In October, 1962, Aerodex, Inc., delivered the 300 master rod bearings in three shipments to the Jacksonville Naval Air Station. Each bearing bore the part number identification "171815," and a stamped symbol "ADX," designating Aerodex, Inc., as the source.

10. For each shipment, the defendant presented to the Department of the Navy an invoice claiming payment at the contract rate of $90.00 each for Curtiss-Wright master rod bearing P/N 171815.

11. These three invoices, together with Forms DD–250 (Material Inspection and Receiving Report), were relied upon by the Department of the Navy in preparing vouchers which incorporated the invoices by reference. The vouchers, with the incorporated invoices and Forms DD–250, constituted claims against the United States for payment of money. The United States paid each claim in full.

12. P/N 117971 and P/N 171815 are nearly identical in appearance. The difference in metal composition of the steel back is not visually discernible, but can be ascertained by simple, non-destructive tests, one of which is the Rockwell hardness test. Since the Aerodex bearings were stamped with P/N 171815, appeared to be new and unused, and met the dimensional requirements, they were, after visual and dimensional inspection, installed in aircraft engines. The "100% final inspection" to be made at Naval Air Station, Jacksonville, by the Navy as provided in the contract, was not made. Indeed, there was no clear showing as to the meaning of the term and one government witness stated that they were not equipped to do such

tests, which would be destructive of the bearings.

13. The 300 bearings delivered by Aerodex were actually P/N 117971 and P/N 117971Y10 and were not in accordance with Wright Aeronautical Division, Curtiss-Wright specifications for P/N 171815 in two particulars: (1) the steel backing was made of low carbon steel, whereas P/N 171815 was constructed of heat treated high carbon steel with a specific hardness requirement fifty percent higher than P/N 117971; and (2) the tin in the lead-tin overlay on the inside diameter was substantially less than the Curtiss-Wright minimum specifications for P/N 171815.

14. Raymond M. Tonks was the president and chief executive officer of Aerodex, Inc., and was active in the daily conduct of the corporation's business. He executed the pertinent Navy contract and approved the purchase of the 300 P/N 117971 bearings, which were furnished the Navy instead of the bearings specified by the contract.

15. On or about September 18, 1962, Frank J. Crawford sent a telegram to the Navy submitting a quotation to supply P/N 171815. At that time there was no more than one such part in Aerodex's inventory. He then arranged for the purchase of 300 P/N 117971 bearings from James G. Boone, signed the purchase requisition therefor, and approved the work orders which provided for the rework and re-identification of P/N 117971 and 117971Y10 to P/N 171815 for shipment to the Navy. Crawford knew the invoice for each such shipment would and did designate the bearings furnished as P/N 171815. Subsequently, Crawford willfully gave to the Navy and the Federal Aviation Agency false information as to the source and the identity of the bearings furnished.

16. Hermann Waker, Jr., in his capacity as manager of the commercial division of Aerodex, Inc., had general responsibility for the daily operation and activities of that division, particularly with respect to inventory, purchases, and sales. Waker knew that the pertinent contract called for P/N 171815, and that bearings of a different part number had been reworked and reidentified at Aerodex, Inc., prior to their shipment to the Navy. Waker supervised the employees who prepared the work orders calling for the rework and re-identification of the bearings.

17. The aforesaid invoices were false and were known by defendants Aerodex, Inc., Raymond M. Tonks, Frank J. Crawford, and Hermann Waker, Jr., to be false. Each of the individual defendants knowingly caused the presentation of the false claims to the United States through the purchase of non-conforming bearings, their rework and re-identification to the part number called for in the contract.

18. Defendant Aerodex, Inc., was advised by the Contracting Officer, Navy Aviation Supply Office on August 13, 1963, that the bearings delivered under the contract were defective in material and workmanship and were not in conformance with the specifications and other requirements of the contract.

19. Upon confirmation, through various tests, that the bearings furnished by defendant corporation were discrepant, the Navy ceased installing them in aircraft engines and instituted a program to recall and retrofit engines in which discrepant bearings had been installed.

20. Between December, 1962, and June, 1963, a retrofit program was performed at Naval Air Station, Jacksonville, during which the bearings furnished by Aerodex were removed from aircraft engines and were replaced with bearings P/N 147846. This new bearing superseded subject bearing P/N 171815, and had been specified by the Navy for replacement in the R1820 engine prior to the order for the retrofit program involving the Aerodex bearings.

21. The recall and retrofit program was based upon the Navy's determination that the unknown and spurious quality of bearings furnished by defend-

ant corporation constituted a safety hazard. The master rod bearing is located in the heart of the power plant section of the R1820 engine and performs a critical function. Cracking of the steel shell of the bearing can cause seizure of the engine and failure in flight, resulting in emergency or crash landing. However, there is no evidence that any main bearing failure, of which there were an increasing number over the years, was caused by a failure of the steel backing.

22. The lead-tin overlay on the inside diameter of the bearing serves as a lubricant until the engine pumps oil during the warm-up period of the engine.

23. The durability of a bearing whose backing or shell is made of low carbon steel, such as in P/N 117971, is inferior to a bearing composed of high carbon steel, such as in P/N 171815. The bearing with the high carbon steel shell has a greater capability to resist stress and fatigue.

24. The Navy was justified in ordering the immediate recall and retrofit of all engines in which discrepant bearings had been installed.

25. When the recall and retrofit program was undertaken, the P/N 171815 bearings were unavailable because the government had earlier designated a new bearing P/N 147846 to supersede the P/N 171815 bearing. This bearing, which incorporated the hard steel shell with other improvements, and its companion parts were, therefore, installed in these engines.

26. The costs incurred by the United States in the recall and retrofit of engines in which discrepant bearings had been installed were a direct and natural consequence of the deception practiced by the defendants.

27. The government claims that the defendants are liable for three classes of costs totaling $213,623.00 in connection with the retrofit program, as delineated in Columns 11, 12, and 13 of Government's Exhibit 111, as well as the contract price of $27,000.00. However, included is the sum of $192.00 per engine

for the cost of the replacement bearing P/N 147846 and its two accompanying parts. This is not a proper charge against the defendants since the government charges defendants with the entire contract price of $27,000.00 for the bearings furnished and under no theory is the government entitled to receive its bearings without any cost.

28. The government claims (Government Exhibit No. 111) that 215 of the Aerodex bearings were installed in aircraft engines at Jacksonville Naval Air Station during the period of October, 1962, to early December, 1962, and that all of these were subsequently involved in the retrofit program ordered by the Navy on December 11, 1962 (Government Exhibit No. 31), to replace the Aerodex bearings. However, this claim is not supported by the evidence (See Defendants' Exhibit No. 31, and the government's exhibits referenced therein), in that:

(a) Six of the engines (514300, 515404, 515874, 516227, 516456, and 523206) originally designated by the government as having had Aerodex bearings installed and later retrofitted, are conceded not to have been sufficiently identified as involved in the retrofit program (Government's Brief, page 28).

(b) Four of the designated engines (513965, 514629, 514664, and 523315) are not shown by the evidence to have been involved in the retrofit program. Although there are thirty other engines listed by defendants in their Exhibit 31, Paragraphs 2A and 3, as not being shown to have been retrofitted, Government's Exhibit 63, Aircraft Engine Rework Record, reflects work performed on those engines during the period of the retrofit program. This record gives sufficient evidence of being authentic and the court credits it fully, in spite of the unfortunate circumstance that the traveler cards for the engines (from which the Rework Record was partially prepared in 1967) were destroyed by the Navy pursuant to its standard regulations during the six year period of the

investigation out of which this case arose.

(c) Five of the designated engines (515146, 515431, 515455, 515713, and 516682) were installed in aircraft after December 10, 1962, the date of the message to all Navy activities to hold installation of suspected engines in abeyance (Government's Exhibit 31).

(d) Two of the designated engines (514183, 514664) were shipped out of Naval Air Station, Jacksonville, after the retrofit program was ordered on December 11, 1962 (Government's Exhibit 20).

(e) Consequently, the defendants have no liability for the Quick Engine Change Costs and the transportation costs (Columns 11 and 13, Government's Exhibit 111) charged against the 17 engines described in paragraphs (a) through (d) hereof. Eleven of these engines had one or both classes of costs charged against them in the total sum of $3,745.00.

29. The total damages sustained by the United States as a natural and proximate consequence of defendants' wrongful acts is $187,919.18, consisting of the $27,000.00 contract price paid for the bearings, and consequential damages of $160,919.18 incurred in the retrofit program, calculated as follows (keyed to Government's Exhibit 111):

(a) Number of Engines

| | | |
|---|---|---|
| 215 | — Claimed retrofitted. | |
| 17 | — Disallowed by court [Paragraphs 28(a) through (d)]. | |
| 198 | — For which retrofit costs allowed. | |

(b) Costs to remove and replace bearing (Column 12):

| | | |
|---|---|---|
| $804.91 | — Per engine cost. | |
| 192.00 | — Less per engine cost of replacement bearing and parts. | |
| $612.91 | — Per engine cost allowed. | |
| $121,356.18 | (198 engines X $612.91) — Total costs allowed to remove and replace bearings. | |

(c) Quick Engine Change Costs:

| | |
|---|---|
| $15,704.00 | — Forty engines (Column 11) |
| 1,969.00 | — Less five engines disallowed by court [Paragraphs 28(a) through (d)]. |
| $13,735.00 | — Total Quick Engine Change costs allowed. |

(d) Transportation costs to ship engines for retrofit and reshipment (Column 13):

| | |
|---|---|
| $27,604.00 | — 133 engines (Column 13). |
| 1,776.00 | — Less eight engines disallowed by court [Paragraphs 28(a) through (d)]. |
| $25,828.00 | — Total transportation costs allowed. |

Based on the foregoing findings of fact, the court makes the following

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the subject matter of the suit.

### The False Claims Act

2. No part of the government's claim is barred by the limitations of Title 31 U.S.C. § 235.

■ 3. The three invoices presented by Aerodex, Inc., were false claims for payment within the meaning of the False Claims Act.

4. Each of the defendants, Raymond M. Tonks, Frank J. Crawford, and Hermann Waker, Jr., knowingly caused to be made and presented the false claims. The knowledge and conduct of each of them in doing so is imputable to defendant Aerodex, Inc. The evidence is clear and convincing that each of the defendants violated the False Claims Act.

5. The failure of the Navy to make the "100% final inspection" as provided in the contract cannot be relied upon by the defendants to escape liability because such an interpretation would allow a supplier to escape liability for any deception where the inspection was not made but the deception discovered by other means—an obviously unfair and unintended result.

6. Neither the acceptance of the non-complying bearings nor any other act attributable to the government constitutes a valid defense or estoppel against such liability.

7. Plaintiff is entitled to recover under the False Claims Statute, Title 31 U.S.C. § 231, from defendants a forfeiture of $2,000.00 for each of the said three invoices, for a total of $6,000.00.

8. The statute requires that the award to the government be double the damages sustained by reason of the commission of the acts in violation of the False Claims Act.

9. Plaintiff is entitled to judgment against defendants, Aerodex, Inc., Raymond M. Tonks, Frank J. Crawford, and Hermann Waker, Jr., jointly and severally, in the total sum of $381,838.36.

### Breach of Warranty

■ Although not necessary for this decision, the court concludes under the breach of warranty count, that:

10. Defendant Aerodex, Inc., caused and committed a breach of warranty in that said defendant delivered to the government bearings materially at variance with the terms of the contract.

11. The government is entitled to recover from the defendant, Aerodex, Inc., the damages naturally and proximately resulting from the breach of warranty in the amounts of $27,000.00, representing the price paid by the Navy for the discrepant bearings and, in addition, $160,919.18, representing consequential damages, or a total of $187,919.18.

12. Counsel for the government shall submit a form of final judgment to the court within thirty days from the date hereof.

### ORDER ON POST-TRIAL MOTIONS

■■ The court has considered the written and oral advices of counsel on defendants' motion for new trial and motion to amend and make additional findings of fact and conclusions of law, as well as the written submissions of counsel on defendants' motion for relief under Rule 60(b), and is otherwise advised in the premises, and finds and concludes that:

A. The evidence is less than clear and convincing that defendant Hermann Waker, Jr., had knowledge that the three invoices submitted to the United States were false. Although defendant Waker, as manager of the commercial division of Aerodex, had charge of the rework and re-identification of the bearings, the evidence is not clear and convincing that he knew that this procedure would result in the filing of a false claim, since the testimony shows that such a re-identification is proper under certain circumstances.

B. As to the other defendants, sufficient grounds for the granting of a new trial or to amend or make additional findings and conclusions have not been shown.

C. The defendants were aware of the existence, location, and prospective testimony of William Haggerty of the Aviation Supply Office and elected not to call him at the trial. Thus defendants cannot claim his failure to so testify as grounds for relief under Rule 60(b). Additionally, it should be noted that in the similar case of United States v. Franklin Steel Products Company, Inc., U.S.D.C., Central District of California (Civil No. 68–1962–EC), at which the witness William Haggerty testified and upon which the defendants rely, the findings of fact entered by that court on April 22, 1971, showed significant differences from this case, including:

Finding 10. " * * * Each of said bearings bore a United States Navy Part Number which was erroneous."

Finding 12. " * * * each of said bearings had a characteristic plainly visible which made such bearing nonconforming to the drawings and specifications set forth in the contracts."

Accordingly, it is ordered and adjudged that:

1. Defendants' motions for new trial and to amend and make additional findings of fact and conclusions of law be and the same are hereby granted as to defendant Hermann Waker, Jr., and denied as to the other defendants, and the findings of fact and conclusions of law are amended as follows:

(a) Finding of fact 17 is amended by deleting the name of Hermann Waker, Jr.

(b) Finding of fact 30 is added, to read as follows:

The evidence is less than clear and convincing that defendant Hermann Waker, Jr., had knowledge that the three invoices submitted to the United States were false. Although defendant Waker, as manager of the commercial division of Aerodex, had charge of the rework and re-identification of the bearings, the evidence is not clear and convincing that he knew that this procedure would result in the filing of a false claim, since the testimony shows that such a re-identification is proper under certain circumstances.

2. Defendants' motion for relief under Rule 60(b) be and the same is hereby denied.

3. Counsel for defendant Waker shall submit to the court within ten days an amended final judgment reflecting the foregoing findings of fact and conclusions of law.

4. The stay order entered by the court on December 7, 1970, will expire by its terms upon the entry of judgment herein.