**UNITED STATES of America, Plaintiff-Appellee,**

v.

**AERODEX, INC., et al., Defendants-Appellants,**

and

**Hermann Waker, Jr., Defendant.**

**No. 71-2801.**

United States Court of Appeals, Fifth Circuit.

Nov. 2, 1972.

Rehearing Denied Feb. 26, 1973.

---

Laurence A. Schroeder, Miami, Fla., for Aerodex & Tonks.

Walters, Moore & Costanzo, David W. Walters, Miami, Fla., for Crawford.

Robert W. Rust, U. S. Atty., Miami, Fla., L. Stanley Paige, Chief Frauds Section, Civil Div., Dept. of Justice, Walter H. Fleischer, Michael H. Stein, Attys., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before PHILLIPS,* THORNBERRY and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This case is about aircraft engine bearings. In 1962 Aerodex, Inc. contracted to sell certain aircraft parts to the Navy Department. Three hundred master rod bearings for the Curtiss-Wright R1820 engine were included in the sale. The bearings delivered were not those specified in the contract. The district court, 327 F.Supp. 1027, held that the invoices submitted by Aerodex for payment for these bearings were "false claims for payment" within the meaning of the Federal False Claims Act, 31 U.S.C.A. § 231 (1970). The government was awarded $381,838.36 with interest. We reverse as to Defendant Tonks and remand with directions to modify the amount of the judgment against Aerodex and Crawford.

At the time pertinent to this lawsuit, the Commercial Division of Aerodex, Inc. was engaged in the purchase and sale of spare aircraft parts. Defendant Raymond Tonks was president and general manager of Aerodex, and defendant Frank J. Crawford was vice president in charge of the Commercial Division.

* Hon. Orie L. Phillips, of the Tenth Circuit, sitting by designation.

On September 18, 1962, Crawford submitted to the U.S. Navy Aviation Supply Office a bid by Aerodex to sell 300 master rod bearings, Curtiss-Wright part number 171815, at a price of $90.00 each. This bid was accepted and was incorporated as a part of a contract entered into between Aerodex and the Aviation Supply Office on October 6, 1962.

As several of the contract provisions are crucial to this appeal, we set them out in full:

### SPECIFICATIONS

Articles furnished from stocks of surplus material are acceptable under this contract provided that the articles so furnished meet the following requirements:

1. All articles furnished must be identified by the applicable Curtiss Wright Corporation, Wright Aeronautical Division part numbers . . . and must conform to the requirements of the respective drawings for said articles.

\*      \*      \*      \*      \*      \*

3. All articles furnished . . . must be in new, unused condition.

### INSPECTION AND ACCEPTANCE

\*      \*      \*      \*      \*      \*

At destination all delivered articles shall be subjected to 100% final inspection by the O & R shop for conformance to the applicable data, drawings and specifications required in the manufacture of said articles. Inspection shall include magnaflux or Zyglo or the equivalent thereof. Upon completion of inspection, and acceptance of satisfactory articles by the receiving activity, an inspection report shall be submitted by the consignee to the Aviation Supply Office, Philadelphia 11, Pennsylvania . . .

### UNSATISFACTORY MATERIAL

Any articles delivered which have been determined by the receiving activity to have failed to conform to the applicable specifications and drawings or which are otherwise considered unsuitable for intended use shall be returned, at the Contractor's expense, for replacement. The necessary replacement articles shall then be shipped, all transportation charges paid, to the destinations specified herein. If any of the articles returned to the Contractor are not replaced, the total amount due to be paid under this contract shall be reduced by the contract value of the returned article or articles.

The bearings supplied by Aerodex to the Navy under this contract were not P/N [part number] 171815 bearings. They were P/N 117971 and 117971Y10 bearings which had been reworked by Aerodex employees. The rework consisted of replacing the metallic overlay on the inside diameter of each bearing. After reworking, each bearing was re-identified with P/N 171815. To the naked eye, the reworked bearings were indistinguishable from new, unused P/N 171815 bearings.

Aerodex' reworked bearings were received and accepted at the Jacksonville Naval Air Station without the "100% final inspection" required by the contract. A number of them were installed in aircraft engines. When the Navy subsequently discovered that the bearings were not the ones contracted for, it removed and replaced those which had been installed. This "retrofit" operation cost $160,919.18. That amount was added to the contract price of $27,000 and the total doubled as provided in the False Claims Act. This, together with the $2,000 statutory penalty for each of the three invoices, resulted in the $381,838.36 judgment for the government.

### I.  Liability Under the False Claims Act

The defendants make a two-pronged attack on the district court's finding of liability under the False Claims Act. They allege that the evidence was (1) legally insufficient in that it did not show the necessary element of *scienter*, and (2) factually insufficient in that it did

not demonstrate the individual defendants' personal knowledge and participation in the alleged fraudulent performance of the contract.

The law is settled in this Circuit that to show a violation of the False Claims Act the evidence must demonstrate "guilty knowledge of a purpose on the part of [the defendant] to cheat the Government," United States v. Priola, 272 F.2d 589, 594 (5th Cir. 1959), or "knowledge or guilty intent," United States v. Ridglea State Bank, 357 F.2d 495, 498 (5th Cir. 1966). *See also* Henry v. United States, 424 F.2d 677 (5th Cir. 1970). This rule is in accordance with the position adopted by the Ninth Circuit, United States v. Mead, 426 F.2d 118 (9th Cir., 1970), the Sixth Circuit, United States v. Ueber, 299 F.2d 310 (6th Cir. 1962), and the Second Circuit, United States ex rel. Brensilber v. Bausch & Lomb Optical Co., 131 F.2d 545 (2nd Cir. 1942), aff'd by an equally divided court, 320 U.S. 711, 64 S.Ct. 187, 88 L.Ed. 417 (1943). The Tenth Circuit in Fleming v. United States, 336 F.2d 475 (10th Cir. 1964), cert. denied, 380 U.S. 907, 85 S.Ct. 889, 13 L.Ed.2d 795 (1965), has reached a contrary conclusion.

The test is easily stated but difficult to apply in the circumstances of this case.

### (a) The Mislabeled Parts

A master rod bearing for the R1820 engine is a cylindrical sleeve approximately 3¼ inches in length and 3¼ inches in diameter. The bearing is composed of steel, with a silver plating material on both the inside and outside surfaces. The inside of the bearing is further coated with a microscopically thin metallic overlay. The inside diameter of the bearing performs the function of a bearing surface which permits the free rotation of the crankshaft within the master rod bearing. This permits the crankshaft to rotate, turning the propellor. Failure of the bearing causes complete engine failure.

The bearing denominated P/N 117971 is impossible to distinguish visually from bearing P/N 171815 but has two basic differences. One difference is hardness of the steel in the shell backing: the P/N 117971 is made of a low carbon steel, while P/N 171815 is made of a harder, high carbon steel. The other difference lies in the composition of the metallic overlay used to line the inside diameter of the bearings: bearing P/N 117971's overlay consists of a lead and indium composition, while the overlay used in P/N 171815 is a lead-tin composition. Aerodex replaced the lead-indium overlay with lead-tin prior to renumbering the P/N 117971 bearings. This reworking did not change the hardness or composition of the bearings' steel shell.

Defendants do not deny that the bearings they sold to the Navy were reworked and renumbered. They argue, nevertheless, that their actions constituted no violation of the False Claims Act. They allege that all military and factory publications available to them showed that both P/N 117971 and P/N 171815 were approved for use in the R1820 engine and that the entire aviation industry at that time considered the two bearings to be interchangeable. Defendants argue, therefore, that they could not have had the requisite intent to "cheat" the government.

We think this argument requires too restrictive a reading of the False Claims Act. The mere fact that the item supplied under contract is as good as the one contracted for does not relieve defendants of liability if it can be shown that they attempted to deceive the government agency. In United States v. National Wholesalers, 236 F.2d 944 (9th Cir. 1956), cert. denied, 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 724 (1957), the defendant contracted to deliver to the Army a number of Delco-Remy generators. Unable to procure these generators, National Wholesalers had substitutes manufactured and attached spurious "Delco-Remy" labels to

them. Although the substitute generators performed according to contract specifications, liability under the False Claims Act was held to attach because of the deliberate misbranding.

■ We think that the deliberate mislabeling in the case at bar, coupled with the fact that the parts delivered did not actually meet the specifications of the contract, compels a finding of liability under the Act. If defendants had, in fact, believed that the reworked P/N 117971 bearings were interchangeable with the P/N 171815 bearings that they had contracted to deliver, they could easily have requested permission from the Navy to deliver the substitute parts or, at least, could have disclosed to the Navy the manner in which they thought they could comply with the contract. The failure to do so indicates nothing less than an intention to deceive.

### (b) *Defendant Crawford*

■■ Defendant Crawford, who was in charge of the Aerodex division which actually performed the reworking operation, argues that the evidence did not make a case against him individually. Crawford signed the bid on the P/N 171815 bearings which Aerodex submitted to the Navy and both initialled the requisition covering the procurement of the P/N 117971 bearings which were used to fill the Navy order and the work orders authorizing the reworking and renumbering of the bearings.

In addition, Crawford gave false information to government agencies investigating the affair. This behavior can only serve to underscore his knowing participation in Aerodex' fraud. In December, 1962, Crawford told the Navy that the P/N 117971 bearings had been obtained in 1959 from the Lycoming Corporation. Yet this was less than two months after he had himself initialled the purchase order sent to James G. Boone, the California supplier from whom the P/N 117971 bearings were actually obtained. Subsequently, Crawford, after having talked to the Navy and having had ample time to check into

the matter if he were unsure of the facts, gave the same false information to the Federal Aviation Agency.

Crawford argues here that the bid submitted to the Navy and the work orders for the reworking of the bearings were prepared by four Aerodex employees known as "planners," who were available to testify at trial but were not called as witnesses. From their failure to testify, Crawford would have us draw an inference unfavorable to the government. These witnesses, however, were available to be called by the defendants as well as the government. We therefore draw no inferences at all concerning their failure to testify. Jenkins v. Bierschenk, 333 F.2d 421 (8th Cir. 1964); *cf.* Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge, 424 F.2d 684 (5th Cir.), cert. denied sub nom. Ocean Drilling & Exploration Co. v. Signal Oil & Gas Co., 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970); Bowyer & Johnson, Inc. v. R. E. Sanders, 271 F. 2d 275 (5th Cir. 1959).

Finally, Crawford finds it "unfathomable" that he could be found liable while his subordinate, Herman Waker, who was more directly in charge of the reworking and renumbering, was not held liable by the district court. We find no inconsistency here. The district court found that the reworking of bearings would, under some circumstances, be proper. It was not the actual reworking of the bearings, but their sale to the government as unreworked bearings, that controls this controversy. The government simply failed to prove that Waker knew, at his level of responsibility, that the reworking was improper in this case.

There was sufficient evidence to support the finding that Crawford was liable.

### (c) *Defendant Tonks*

■ The evidence as to defendant Tonks was considerably weaker. Tonks, Aerodex' chief executive officer, signed the October 6, 1962, contract with the government. The purchase order for

the reworked P/N 117971 bearings bears a rubber stamp facsimile of his signature. That is the sum total of the direct evidence linking Tonks to the sale of the mislabeled bearings. At trial he testified that he had no knowledge of the origin or subsequent use of the bearings until the government began its investigation.

The government argues that the requisite guilty knowledge on the part of Tonks can be inferred from the facts that he was in close contact with defendant Crawford and that the purchase order for the P/N 117971 bearings was signed less than three weeks before execution of the Navy contract.

We think these inferences are too weak to take the place of missing facts. The government did not prove a case against Tonks, and the district court's finding to the effect that he knowingly caused the presentation of a false claim was clearly erroneous.

## II. *Failure to Inspect*

■ The government admits that the Navy did not perform the "100% final inspection" called for by the contract. Defendants proved at trial that a simple and inexpensive non-destructive test, the Rockwell Hardness Test, would have shown that the bearings did not meet contract specifications.

The inspection clause in the contract does not, however, insulate appellants from liability for fraud. First, a reading of the clause shows that it is for the government's benefit and imposes no duty on the government in favor of the appellants. Second, Article 5, the inspection article, provides that inspection is not conclusive "as regards latent defects, fraud, or such gross mistakes as to amount to fraud." This provision embodies the established rule that, even where final inspection is the obligation of the government, such obligation does not absolve a contractor on liability for fraud. *See* United States v. American Packing Corp., 125 F.Supp. 788 (D.N.J. 1954); United States v. United States Cartridge Co., 95 F.Supp. 384 (E.D.Mo.

1950), aff'd, 198 F.2d 456 (8th Cir. 1952), cert. denied, 345 U.S. 910, 73 S. Ct. 645, 97 L.Ed. 1345 (1953); United States v. Collyer Insulated Wire Co., 94 F.Supp. 493 (D.R.I.1950).

■ To the extent that the wording of the clause itself does not militate in defendants' favor, they rely on the so-called *"Christian doctrine"* as a second line of defense based on the failure to inspect.

Briefly put, Aerodex argues that, regardless of the wording of the contract, if the government had performed the tests required by specific Armed Services regulations, it would have discovered irregularities long before any of the bearings were installed in aircraft engines, and most of the consequential damages flowing from the "retrofit" program would have been eliminated. Aerodex contends that these regulations are a part of the contract as a matter of law.

G. L. Christian & Associates v. United States, 312 F.2d 418, 160 Ct.Cl. 1, cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L. Ed.2d 314 (1963), was a suit for lost profits by contractors whose housing project had been cancelled by the government when the Army decided to deactivate Fort Polk, Louisiana. The court held that anticipated profits were not allowable because, even though the contract did not contain any express provision allowing the government to terminate the contract for its convenience, the government was entitled to the benefit of the Armed Services Procurement Regulations which required that such a clause be inserted in all construction contracts. The court held that the standard termination article required by the Regulations was incorporated in the contract by operation of law, even though it was not contained therein expressly.

Subsequently, the Court of Claims held that this *Christian* doctrine could be applied for the benefit of a claimant, as well as the United States. Moran Bros., Inc. v. United States, 346 F.2d

590, 171 Ct.Cl. 245 (1965). The court ruled that an appeal was timely when filed within 60 days after a hearing examiner's decision, as required by Atomic Energy Commission regulations, despite the fact that the contract contained a clause providing that an appeal should be taken within 30 days.

More recently, the *Christian* doctrine has been expanded in General Services Administration v. Benson, 415 F.2d 878 (9th Cir. 1969). Benson, embroiled in a dispute with the Internal Revenue Service over certain property he had purchased from the General Services Administration, filed suit to compel the GSA to produce various documents allegedly needed in presenting his case in the tax matter. In affirming the district court's order enjoining the GSA from withholding the records, the court cited a GSA regulation requiring disclosure of records in the absence of a "compelling reason" for non-disclosure.

Defendants here rely on §§ 14–101, 14–201, 14–204, and 14–205 of the Armed Services Procurement Regulations. These sections require, in unambiguous terms, that the government inspect all goods prior to acceptance. They also require that, when the goods tendered do not meet specifications, the action taken shall be in accordance with the applicable contract provisions (which here would require that the goods be returned to the contractor).

Even if the regulations are considered to be incorporated into the contract by operation of law under the *Christian* doctrine, nevertheless, they do not insulate appellants from liability for their own fraud any more than the contract itself does for the same reasons.

In addition, appellants failed to prove that 100% inspection would necessarily have included a Rockwell Hardness Test. Since hardness of the steel used in the bearing is controlled at the manufacturing level and is the same for all bearings of a given part number, the appearance of that part number on the bearing gives notice of the bearing's hardness. Thus, only upon suspicion of fraudulent

misnumbering would an inspector conduct a Rockwell Hardness Test.

The lower court was correct in holding that the contract "could not be relied upon by the defendants to escape liability because such an interpretation would allow a supplier to escape liability for any deception where the inspection was not made but the deception discovered by other means—an obviously unfair and unintended result." This holding also applies to the defendants' reliance on the regulations.

### III. *Measure of Damages*

The question raised on this appeal as to the measure of damages applied by the district court is difficult to resolve because there appears to be no precedent against which to judge the facts of this case.

The district court computed damages by first adding the contract price of the bearings, $27,000.00, to the $160,919.18 cost incurred in removing and replacing the P/N 117971 bearings which had been installed in aircraft engines. This sum, $187,919.18, was then doubled under the statutory formula in the False Claims Act which imposes liability for the submission of a false claim in "double the amount of damages which the United States may have sustained by reason of doing or committing such act . . ." 31 U.S.C.A. § 231 (1970).

The cases that have considered the application of this statute's double damage provision have generally been of two kinds. One line of cases involves an overpricing for what was sold and delivered to the government. Here the damage sustained by the United States is the difference between the reasonable cost of the goods sold and the price the government actually paid for the goods, and recovery is double that amount. *See, e. g.,* United States v. Foster Wheeler Corp., 447 F.2d 100 (2d Cir. 1971); United States v. Ben Grunstein & Sons Co., 137 F.Supp. 197 (D. N.J. 1956); United States v. American Packing Corp., *supra.*

In the other line of cases, the government has been billed and has paid for a greater quantity of goods or services than it has received. The basis for the double damage recovery is then the amount it paid for the goods that were short in delivery. *See, e. g.,* United States v. Koenig, 144 F.Supp. 22 (E.D. Pa. 1956).

These cases all differ somewhat from this one because they involve a quantitative measure, a difference between what the government paid and what it should have paid for goods that were acceptable. None involved consequential damages incurred as a result of defective goods.

■ Upon careful analysis, we hold that the language of the False Claims Act does not include consequential damages resulting from delivery of defective goods. The statute assesses double damages attributable to the "act," which in this case is the submission of the false vouchers. The submission of these vouchers was not the cause of the government's consequential damages. The delivery and installation of the bearings in the airplanes, not the filing of the false claim, caused the consequential damages.

In a case of this kind, damages under the False Claims Act must be measured by the amount wrongfully paid to satisfy the false claim. United States v. Woodbury, 359 F.2d 370 (9th Cir. 1966); United States v. American Packing Corp., *supra.*

Toepleman v. United States, 263 F.2d 697 (4th Cir.), cert. denied sub nom. Cato Bros., Inc. v. United States, 359 U. S. 989, 79 S.Ct. 1119, 3 L.Ed.2d 978 (1959), relied upon by the government, is not authority to the contrary, in *Toepleman,* the defendants had obtained crop support loans from the Commodity Credit Corporation by fraudulently representing that the cotton collateral of the pledged promissory notes had been produced by the makers of the notes. The government had sold the collateral for less than the total amount of the loans, and the Fourth Circuit permitted the government to recover double the foreclosure deficiency under the False Claims Act. *Toepleman's* reasoning is inapposite here, because the damages were in no way consequential, *i. e.,* additional losses incurred as proximate results of the act of submitting a fraudulent loan application. Rather, the government was permitted to double the amount still owing on the fraudulently obtained loans. In this respect, *Toepleman* closely resembles both lines of False Claims Act cases, as an example of the government being either overcharged for the correct quantity of goods or charged for goods short in delivery.

■ We think that a proper application of the double damage provision limits the government's claim to the amount that was paid out by reason of the false claim. We treat the matter as if the claims for $27,000 for P/N 171815 bearings were false because those bearings were never delivered. The government paid $27,000 for bearings it did not receive. This amount must be doubled, and the $2,000 statutory penalty must be added for each of the three invoices. The correct amount recoverable under the False Claims Act, consequently, is $60,000.00, and the judgment for $381,838.36 is reversed.

### IV. *Breach of Warranty*

The consequential damage award to the government can be sustained on another theory. The district court found that Aerodex committed a breach of warranty in delivering to the government bearings which were at variance with those required by the contract. The issue is whether Aerodex has an adequate defense to the recovery of damages for that breach of warranty.

The warranty provisions of the contract are contained in Clause 33, which reads in pertinent part:

(a) Notwithstanding inspection and acceptance by the Government of articles furnished under this contract or any provision of this contract con-

cerning the conclusiveness thereof, the Contractor warrants that at the time of delivery *(i)* all materials delivered under this contract will be free from defects in material or workmanship and will conform with the specifications, and all other requirements of this contract; . . . .

(b) Within one year after the delivery of any article under this contract, written notice may be given by the Government to the Contractor of any breach of the warranties in paragraph (a) of this clause as to such article. Within a reasonable time after such notice, the Contracting Officer may either *(i)* require the prompt correction or replacement of any article or part thereof *(including preservation, packaging, packing, and marking)* that did not at the time of its delivery conform with the requirements of this contract within the meaning of paragraph (a) of this clause, or thereafter does not so conform in consequence of any such breach; or *(ii)* retain such article, whereupon the contract price thereof shall be reduced by an amount equitable under the circumstances and the Contractor shall promptly make appropriate repayment. . . .

\* \* \* \* \* \*

(e) The remedies afforded the Government by paragraph (b) of this clause shall be exclusive as to any breach of the warranties in paragraph (a) of this clause, except any such breach involving latent defects, fraud, or such gross mistakes as amount to fraud.

■ The government did not pursue either of the remedies afforded by subparagraph (b) of Clause 33. This omission does not provide Aerodex with a defense to the breach of warranty claim, however, because cases of fraud are specifically excepted from exclusivity under subparagraph (e).

Aerodex' main contention is that the government's failure to conduct the "100% final inspection" precludes it from any remedy for the breach of warranty.

Aerodex makes the following arguments to support its position:

(a) The damages were not foreseeable, since Aerodex could not have known that the government would not make the required inspections;

(b) The government cannot recover damages which it could have avoided by the exercise of reasonable diligence;

(c) The language of the "inspection" and "unsatisfactory material" clauses of the contract is repugnant to the warranty clause, and since the former are typed while the latter is printed, the former clauses must be given precedence, making rejection and return of nonconforming bearings the government's exclusive remedy; and

(d) The *Christian* doctrine required the government to perform tests required by specific Armed Services regulations.

■■ These arguments are irrelevant because the breached warranty was an express one. Aerodex expressly warranted that the delivered bearings were of a specific serial number, when in truth they were not. The general rule is that a buyer is entitled to rely upon the express warranty of the seller, especially where the warranty is descriptive and the defects are not readily apparent, and the buyer's failure to inspect constitutes no defense for the seller. 8 S. Williston on Contracts § 973 (1964); 46 Am.Jur. Sales § 330 (1943); 77 C. J.S. Sales § 311(b) (1952); Refinery Equipment, Inc. v. Wickett Refining Co., 158 F.2d 710 (5th Cir. 1947). The government was therefore entitled to rely solely upon Aerodex' express warranty describing the bearings, and its failure to inspect the delivered bearings is of no legal consequence.

*Herman Waker, Jr.*

■ The government filed a notice of appeal from the district court's order dated November 29, 1971, dismissing the action against Herman Waker,

Jr. Because the government failed to file a brief, however, we dismiss the appeal. F.R.A.P., Local Rule 9(b).

### Directions on Remand

In summary, we vacate the judgment of the district court and remand for entry of a joint and several judgment against Aerodex and Crawford in the amount of $60,000 under the False Claims Act, entry of a judgment in the additional amount of $160,919.18 against Aerodex, which is the only defendant liable for damages for breach of warranty, and dismissal of the claim filed against Tonks. Such judgments shall bear interest as provided by law. Tonks' costs will be borne by the appellee. The remaining costs will be divided equally between Aerodex and Crawford on the one hand, and the United States on the other.

Reversed and remanded with directions.