**UNITED STATES of America, Plaintiff,**

v.

**ADVANCE TOOL COMPANY and William R. McGillivray, Defendants.**

No. 94–0062–CV–W–1.

United States District Court, W.D. Missouri, Western Division.

July 14, 1995.

Thomas Larson, Assistant United States Attorney, Kansas City, MO, for plaintiff.

William R. McGillivray, Mancelona, MI, pro se.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

DEAN WHIPPLE, District Judge.

#### I. INTRODUCTION

This civil action was brought by the United States against Defendants Advance Tool Company ("Advance Tool"), a Michigan corporation, and William R. McGillivray ("McGillivray"), president and sole owner of Advance Tool, in his individual capacity. Plaintiff's motion for default judgment as to Advance Tool was granted by this Court's

order dated August 22, 1994, and the case proceeded to trial against McGillivray in his individual capacity. A bench trial was held on March 27, 30 and 31, 1995. Prior to trial, Plaintiff abandoned Counts II and III of the Complaint. Count I seeks recovery under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* In the alternative, Plaintiff seeks recovery in Count IV under common law theory of payment under mistake of fact, and in Count V under a common law theory of fraud.[1]

At trial, Plaintiff called thirteen (13) witnesses, introduced the deposition testimony of five (5) witnesses, and introduced fifty-nine (59) exhibits. McGillivray, appearing *pro se*, cross-examined witnesses and argued his case, however, he did not testify, call any witnesses or otherwise present any evidence. After hearing all the evidence presented at trial, the Court determined that McGillivray had violated the FCA, and that Plaintiff was entitled to receive from McGillivray actual monetary damages in the amount of $210,-863.33 together with $5,000.00 per false invoice submitted by him. Those findings are hereby supplemented and modified pursuant to FED.R.CIV.P. 52(b).[2] As further set forth below, the Court finds that McGillivray violated the FCA, and is liable to Plaintiff in the amount of $365,000.00.

## II. FINDINGS OF FACT

1. During the time period outlined in the Complaint, January 1, 1988 to March 4, 1992, McGillivray was president and sole owner of Advance Tool, a Michigan corporation with its principal place of business at 407 Rose Street, Mancelona, Michigan 49659.

2. At all times relevant to this action, McGillivray acted on behalf of Advance Tool and on his own behalf in all his dealings with the Federal Supply Service ("FSS") of the General Services Administration ("GSA").

3. During the time period outlined in the Complaint, the FSS of GSA, 1500 East Bannister Road, Kansas City, Missouri, through contract specialists and purchasing agents, sought bids or quotations from various sources for purchases of hand tools and parts ("tools") required by the military and other governmental agencies. McGillivray responded to the requests, and the FSS obtained quotations on numerous tools from McGillivray and ordered tools from McGillivray on numerous occasions.

4. Purchases of the tools in question were made pursuant to the small purchase procedures provided for in certain Federal Acquisition Regulations ("FARS"), codified at 48 C.F.R., Chapter 1, Part 13. All of the solicitations were for small quantities of tools, in fact, some of the solicitations requested bids for only one or two tools of each type.

5. McGillivray received numerous Requests for Quotations on GSA's Standard Form 18, which were issued under Blanket Purchase Agreements ("BPA's") as authorized by the FARS at 48 C.F.R. Chapter 1, Subpart 13.2. The terms and conditions attached to and made a part of the Requests for Quotations specified, *inter alia*, that, "[u]nless clearly indicated in the offer that an 'equal' product is offered, the offer shall be considered as offering a referenced brand name product."

6. In addition to receiving the Requests for Quotations, McGillivray also was contacted by telephone by FSS purchasing agents for the purpose of soliciting McGillivray's quotations on various hand tools pursuant to GSA's "open market" purchasing procedures.

7. Under both the Blanket Purchase Agreement and the open market purchasing procedures, GSA sought to purchase tools, each of which was identified in documents sent to McGillivray, or in telephone conversations with McGillivray, by a National Stock Number ("NSN"). For each tool identified by an NSN, GSA establishes written descriptions of the tool, including, in appropriate cases, the name of the manufacturer(s) pro-

---

1. In light of Plaintiff's failure to prove actual damages under the FCA, and specifically Plaintiff's inability to account for the vast majority of the 1301 tools McGillivray shipped to General Services Administration, as further set forth in the body of this Order, it is clear that Plaintiff

cannot recover under Counts IV and V, making further discussion of these claims unnecessary.

2. After issuing its findings of fact and conclusions of law from the bench, the Court expressly reserved the right to modify such at a later date.

ducing the tool, and the manufacturer's part number for the tool.

8. For purchasing purposes, particularly under the small purchase provisions of the FARs, certain NSN descriptions call for the tool produced by the particular manufacturer(s) named in the description. Tools called for under such NSN descriptions are referred to as "brand name" by FSS. Other NSN descriptions call for tools produced by a named manufacturer or an equivalent or "equal" tool. Tools called for under such NSN descriptions are referred to as "brand name or equal" by FSS.

9. The BPA's provide that if a supplier wishes to furnish tools other than, but equal to, brand name tools, the supplier is required to insert the name of the product in the solicitation or otherwise clearly identify the product. In addition, a supplier wishing to submit an "equal" is required to submit a sample of the tool, drawings, or a description of its salient characteristics so that FSS and GSA can determine whether the proposed "equal" product is acceptable. If a tool submitted as a proposed "equal" is found to be acceptable, it will be added to the NSN description for future purchasing activity.

10. McGillivray was advised of the procedure for obtaining approval for substitute or "equal" tools by the terms and conditions of the Requests for Quotations to which he responded. Further, the purchase orders sent to McGillivray specified that the tools to be supplied were to be in accordance with the applicable NSN descriptions.

11. During the time period outlined in the Complaint, McGillivray received orders for 74 different types of tools, all but one of which was either a "brand name" request or a "brand name or equal" request. While the Court heard evidence concerning the one order McGillivray received for a tool to be supplied pursuant to item specifications contained in a drawing, Plaintiff made no attempt to explain why this item was relevant to a determination of McGillivray's liability to Plaintiff under the FCA.[3]

12. During the time period outlined in the Complaint, in response to the purchase orders received from FSS, McGillivray furnished 1301 tools that were fabricated for him by small machine shops in Michigan. McGillivray knew that none of the tools furnished by Advance and McGillivray was a tool made by the manufacturer(s) named in the NSN description for the tool. None of the tools furnished by Advance and McGillivray was submitted by them for evaluation by GSA to determine whether the tool to be furnished was equal to the brand name tool requested in the purchase order.

13. McGillivray admitted to investigators that it was his practice to obtain either a sample of an NSN tool or the manufacturer's drawing(s) for a tool, and then either to "reverse engineer" from the tool sample or use the drawing(s) as a basis for ordering tools from machine shops in Michigan. The tools which the Michigan machine shops manufactured for McGillivray were then shipped by McGillivray to fill the GSA purchase orders which, by listing or referring to particular NSN's, called for brand name tools.

14. Among the specific brand name tools requested by the FSS were tools manufactured by Cummins Engine Company, Grove Valve and Regulator Company, Somat Corporation, Outboard Marine Corporation and Hamilton Standard, a division of United Technologies Corporation. Deposition testimony from representatives of these companies indicated that neither McGillivray nor Advance Tool was authorized to utilize the proprietary drawings of these companies to design or manufacture tools. In addition, testimony from the small machine shop operators who manufactured tools for McGillivray indicated that in the instances in which McGillivray provided drawings to be utilized to manufacture tools, all identifying data had been removed, including the manufacturer's name and the part number.

15. McGillivray represented to GSA that Advance Tool was a manufacturer of numerous NSN tools, but he failed to disclose that the tools he was selling to the government

---

3. It is unclear to the Court whether the invoice for this item is included in Plaintiff's Exhibit 28 which contains the 688 invoices which are the subject of this litigation.

were not manufactured under license from or agreement with the manufacturers listed in the NSN descriptions. McGillivray also failed to disclose that the tools he was selling to the government had been fabricated in small machine shops from specifications derived through a "reverse engineering" process, rather than having been fabricated according to specifications furnished by the manufacturers listed in the NSN descriptions.

16. McGillivray admitted to investigators that the tools he supplied did not meet certain specifications. For example, McGillivray admitted that he coated some tools with black spray paint rather than the black oxide coating specified in the NSN descriptions. The NSN specifications uniformly required that the part number and manufacturer's name be displayed on the tools. McGillivray also admitted to investigators that he did not place part numbers or his company's name on the tools, as required by NSN specifications, because he did not have liability insurance and he did not want the tools to be traced back to him.

17. When McGillivray was asked by Michelle Rossi ("Rossi"), a GSA employee at the time, whether he was in fact supplying the tools described in the purchase orders, McGillivray falsely stated that he had been furnished the proprietary drawings from which to manufacture the tools. Rossi testified that it is common in the industry for a tool manufacturer to license proprietary drawings to other manufacturers. In addition, McGillivray falsely stated that he placed the part number or NSN on the tools. Unfortunately, Rossi failed to specifically ask McGillivray the pivotal question, whether the tools he was supplying were "brand name" as required.

18. If GSA had known the true quality and method of manufacture of the tools supplied by McGillivray, and that McGillivray was not an authorized manufacturer providing tools made to manufacturers' specifications, GSA would not have ordered or paid for the tools furnished by McGillivray.

19. Given the small number of any particular type of tool supplied by McGillivray, and the fact that the tools had no identifying manufacturer's name or number, recovery of these tools by the Government was difficult at best. However, expert testimony and reports introduced at trial indicated that, of the tools recovered, some were of inferior quality, others were nonfunctional and none was marked with the manufacturer's name or part number as required by the solicitations.

20. Of the 1301 tools delivered to GSA by McGillivray which are the subject of this litigation, Plaintiff introduced 14 into evidence at trial. Plaintiff was unable to provide the Court with evidence as to the whereabouts of the other tools or any specifics as to whether any of these 1301 tools were put to use, are still in use, or the extent of their actual utility. Concerning these 1301 tools, GSA never rejected a single one or otherwise gave McGillivray any indication that the tool did not meet its specifications until Plaintiff began its investigation which ultimately led to the filing of this suit.

21. Although some testimony was introduced concerning inspection and acceptance of the tools at destination, the BPA's provided that the supplier was "responsible for performing or having performed all inspections and tests necessary to substantiate that the supplies or services furnished ... [under] the contract conform[ed] to contract requirements." In addition the BPA's stated that this clause took "precedence over any Government inspection and testing required in the contracts specifications."

22. At trial, the Government introduced 688 separate invoices submitted to GSA by McGillivray and Advance Tool which requested payment for specific NSN's. Defendant McGillivray objected to only two of the invoices, and the Court received all of the invoices as evidence. Of the invoices introduced as evidence, 686 comprise the claims which the Government alleges to be false in violation of the FCA. The invoices submitted by McGillivray requested payment for tools and costs of shipping. Pursuant to the invoices submitted by McGillivray, GSA paid Advance Tool a total of $210,863.33.

22. The Court finds that McGillivray did not deliver what the invoices purported to show had been delivered. McGillivray deliv-

**1016**

ered tools that he knew were not provided by manufacturers specified in the applicable descriptions of the tools. Further, the Court finds that McGillivray knew that the tools had not been submitted to GSA for evaluation to determine whether the tools were satisfactory substitutes for the specified items, as required by the solicitations to which he responded. The Court finds that McGillivray deliberately ignored the plain language of the solicitations which called for specific brand name products and deliberately ignored the procedure to submit an "equal" product. Therefore, the Court finds that the invoices were in fact "false" under the FCA and McGillivray knew that these invoices were false when they were presented for payment.

### III. CONCLUSIONS OF LAW

■ An individual[4] is liable under the FCA, if the individual:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government[.]

31 U.S.C. § 3729(a). For purposes of this section, "knowingly" is defined such that "no proof of specific intent to defraud is required," and means that the individual:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information....

31 U.S.C. 3729(b). Damages under the FCA are two-fold, a civil penalty between $5,000 and $10,000, together with treble actual damages. 31 U.S.C. § 3729(a).

■ Accordingly, to recover under the FCA, Plaintiff must prove by a preponderance of the evidence, 31 U.S.C. § 3731, that:

(1) McGillivray presented false claims for payment to an employee of the GSA; and (2) McGillivray, at the time the claims were submitted, knew that the information submitted in the claims was false, or acted in deliberate ignorance of the truth or falsity of the information submitted in the claims. 31 U.S.C. § 3729(a) and (b). As noted above, proof of specific intent to defraud is not required under the FCA. 31 U.S.C. § 3729(b); *U.S. v. Cooperative Grain and Supply Co.,* 476 F.2d 47, 58–60 (8th Cir.1973); *U.S. v. Children's Shelter, Inc.,* 604 F.Supp. 865, 866 (W.D.Okl.1985).

■ As the facts outlined above indicate, McGillivray presented invoices to GSA for payment which McGillivray knew at the time of presentation were false. The invoices requested payment for the specified brand name tools outlined in the solicitations to which McGillivray responded; however, McGillivray did not deliver brand name tools. He in fact supplied the government with tools which he had "reverse engineered" and which had been manufactured by small machine shop operators in Michigan.

■ It is not a defense that GSA failed to discover that the tools supplied by McGillivray were unauthorized substitutes for those specified. There was no "final inspection" provision which imposed a duty on the government in favor of McGillivray. If the government failed to inspect, that fact would not insulate McGillivray from liability for false or fraudulent claims. *See U.S. v. Aerodex, Inc.,* 469 F.2d 1003, 1009 (5th Cir.1972). Further, the evidence indicated the solicitations required the supplier to perform all inspections and tests necessary to determine that the supplies conformed to contract requirements. Additionally, if it is shown that the defendants attempted to deceive the government entity, it is not a defense to a claim under the FCA that the tools delivered to the government entity were as good as those requested. *See id.* at 1007; *Chemray Coatings Corp. v. U.S.,* 29 Fed.Cl. 278, 284 (1993).

---

4. Corporate officers are liable, in their individual capacity, under the FCA if they knowingly make false claims for payment to the United States on behalf of the corporation. *See U.S. v. Entin,* 750 F.Supp. 512 (S.D.Fla.1990).

McGillivray's contention that GSA had no authority to order brand name tools is unfounded. The regulation he cites, at 48 C.F.R. § 510.004(b)(2), specifically states, "[i]n small purchases, brand name policies and procedures apply *to the extent practical.*" [Emphasis added] Further, the competition requirements in 48 C.F.R. Ch. 1, Part 6, do not apply to "[c]ontracts awarded using the small purchase procedures of part 13." 48 C.F.R. § 6.001(a).

■ The Court finds that there were two possible ways for McGillivray to have legitimately filled the purchase orders which he received from GSA. The first was to supply "brand name" tools specified in the NSN descriptions. The second was to supply tools which had been evaluated and approved by GSA as "equal" tools. Further, the Court finds that tools which would have met the NSN specifications in either regard set forth were not delivered. Therefore, the Court concludes the invoices requesting payment for tools identified by NSN's were false because tools which could have legitimately met the descriptions of such were not delivered.

■ After determining that Defendant is in violation of the FCA, it is necessary to determine the extent of his monetary liability. As noted above, the FCA provides for treble actual damages and $5,000.00 to $10,000.00 civil penalties per false statement.[5] Concerning actual damages, Plaintiff contends that the proper measure is the amount it paid for the tools, namely $210,863.33. However, the only authority cited supporting this proposition, *U.S. v. Aerodex, Inc.,* 469 F.2d at 1011, involved the recoverability of consequential damages resulting from delivery of defective goods, an issue not before this Court. Additionally, *Aerodex* was issued prior to *United States v. Bornstein,* 423 U.S. 303, 316 n. 13, 96 S.Ct. 523, 531 n. 13, 46 L.Ed.2d 514 (1976), where the Supreme Court expressly ruled that actual damages under the FCA are equal to the difference between the market value of the products received and retained and the market value of those requested. *Accord U.S. v. Cooperative Grain and Supply Co.,* 476 F.2d 47, 62

(8th Cir.1973); *U.S. v. Killough,* 848 F.2d 1523, 1532 (11th Cir.1988).

■ Unfortunately, Plaintiff failed to present sufficient evidence at trial concerning the fair market value of the tools delivered to GSA so as to allow the Court to determine the extent of the Plaintiff's actual damages. Several of Plaintiff's witnesses, including Albert Lobo, an engineer with GSA's testing and analysis branch, testified that certain of Defendant's tools were only partially functional at best. In addition, Plaintiff introduced an expert report prepared by Dr. Barbara Kinzig which concluded that "a number" of the 18 tools analyzed were "not functional." However, Plaintiff failed to set forth specific evidence as to whether any of the 1301 tools were ever used, are still in use, or if any of the tools had any utility whatsoever. While the Court is well aware of the difficulty involved in obtaining and presenting such evidence, the Court deems it a fair requirement in light of GSA's utter ineptitude in discovering McGillivray's fraudulent scheme. Therefore, the Court is unable to award actual damages to Plaintiff.

■ The second remedy available to Plaintiff under the FCA is the $5,000.00 to $10,000.00 civil penalty per false statement. As a preliminary matter, it is important to note that civil penalties are recoverable under the FCA even in situations such as the one at bar where the United States has failed to show actual damages. *U.S. ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991) (citing *Rex Trailer Co. v. U.S.,* 350 U.S. 148, 153 n. 5, 76 S.Ct. 219, 222 n. 5, 100 L.Ed. 149 (1956)). As noted above, under the FCA, each knowingly false "claim for payment" constitutes a separate violation. 31 U.S.C. § 3729(c); *see also Pena v. U.S. Dep't. of Agriculture,* 811 F.Supp. 419, 426–27 (E.D.Ark.1992). Consequently, Plaintiff contends that each of the 686 invoices which McGillivray sent to GSA requesting payment constitutes a separate and distinct violation. *See e.g., U.S. v. Rule Industries,* 878 F.2d 535 (1st Cir.1989). In addition, Plaintiff argues that $5,000.00 con-

---

**5.** Under the Act, Plaintiff was authorized to request reimbursement for the costs related to this

lawsuit. However, in that such a request was not made, the Court need not address this issue.

stitutes the minimum amount to which it is entitled under the FCA, and it is, therefore, entitled to $5,000.00 for each of the 686 invoices in the total amount of $3,430,000.00.

■ Supporting Plaintiff's position that the Court does not have the discretion or the inherent power to award damages below the statutory amount is *U.S. v. Killough,* 848 F.2d 1523 (11th Cir.1988). In *Killough,* the 11th Circuit ruled that "imposition of forfeitures under the FCA is not discretionary, but is mandatory for each claim found to be false." *Id.* at 1533. This ruling was based upon legislative history which indicated that Congress specifically disapproved of the concept that there must be a "fair ratio" between actual damages and civil penalties. *Id.* In accord with this position are the vast majority of courts which have addressed the issue. *See U.S. v. Hughes,* 585 F.2d 284, 286 (7th Cir.1978); *Brown v. U.S.,* 524 F.2d 693, 705–06, 207 Ct.Cl. 768 (1975); *U.S. v. Halper,* 664 F.Supp. 852, 853 (S.D.N.Y.1987) (*vacated on other grounds,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989)); *U.S. v. Diamond,* 657 F.Supp. 1204, 1206 (S.D.N.Y. 1987). The Court was only able to locate two decisions in which courts held that the monetary range of civil penalties is subject to some judicial discretion. *See Peterson v. Weinberger,* 508 F.2d 45, 55 (5th Cir.1975); *U.S. v. Greenberg,* 237 F.Supp. 439, 445 (S.D.N.Y.1965). However, both of these cases are clearly distinguishable in that the government in both cases did not contest the existence of such judicial discretion. *Peterson,* 508 F.2d at 55; *Greenberg,* 237 F.Supp. at 445.

As a result of the above-cited persuasive authority supporting Plaintiff's position, the utter dearth of authority to the contrary, and in the absence of direction from the Court of Appeals for the Eighth Circuit on this issue, and most importantly, in light of the clear language of the FCA, the Court rules that it lacks the discretion or inherent power under the FCA to award damages below the range set forth therein. However, in that civil penalties are indeed subject to constitutional restraints, *Montana Dep't of Revenue v. Kurth Ranch,* 511 U.S. ——, ——, 114 S.Ct. 1937, 1945, 128 L.Ed.2d 767, 778 (1994), this determination does not terminate the Court's inquiry as to the propriety of awarding Plaintiff $5,000.00 for each of the 686 false invoices.

■ The Excessive Fines Clause of the Eighth Amendment to the United States Constitution applies to civil proceedings and serves to limit the Government's power "to extract payments as punishment for some offense." *Austin v. U.S.,* 509 U.S. ——, ——, 113 S.Ct. 2801, 2805, 125 L.Ed.2d 488, 497 (1993). A civil sanction that is not designed solely for remedial purposes, but also for retributive or deterrent purposes, constitutes "punishment." *Id.,* 509 U.S. at ——, 113 S.Ct. at 2806, 125 L.Ed.2d at 498. The only case that the Court was able to locate where a court applied these principles to a suit under the FCA is *U.S. ex rel. Smith v. Gilbert Realty Co,* 840 F.Supp. 71 (E.D.Mich. 1993). In *Smith,* the defendant violated the FCA 58 times by making 58 false statements to the local housing authority and the court found the defendant liable for $4,890.00 in trebled actual damages. *Id.* at 72. The plaintiff sought $5,000.00 per violation in the total amount of $290,000.00. *Id.* at 74. However, the court refused to award this amount, finding that any civil penalty in excess of $35,000.00 to be excessive and violative of the Excessive Fines Clause. *Id.* at 75. In determining this amount, the *Smith* court considered the nature of the defendant's conduct and found that only seven of the 58 false statements were sufficiently serious so as to warrant a $5,000.00 civil penalty.

After a thorough examination of Plaintiff's illegal conduct as evidenced in the pre-trial record, the trial transcript and the numerous exhibits and depositions admitted into evidence at trial, the Court finds that awarding Plaintiff $3,430,000.00 in civil penalties would be unconstitutionally excessive under the Eighth Amendment. This finding is based upon Plaintiff's inability to prove actual damages at trial, the government's poor investigative procedures, and its confusing regulatory and contractual purchasing arrangements which virtually encourage the type of conduct at issue here. In the case at bar, McGillivray supplied GSA with 73 different types of tools which were not of the type of quality requested by GSA. The Court finds that a civil penalty of $5,000.00 per tool in the

amount of $365,000.00 does not violate the Excessive Fines Clause.

## IV. CONCLUSION

It is hereby ORDERED, ADJUDGED, AND DECREED that judgment be entered in favor of the United States of America and against Defendants Advance Tool Company and William R. McGillivray jointly and severally in the amount of $365,000.00, plus interest at the statutory rate, which rate at the date hereof is 5.53% and pursuant to 28 U.S.C. § 1961(b) computed daily and compounded annually on the total from the date of judgment until paid in full.[6]

---

**6.** There are a number of pending motions before the Court, each of which will now be addressed briefly. First, the Court's ruling that Plaintiff is not entitled to actual damages under the False Claims Act has the effect of making moot Plaintiff's motion for treble actual damages. *See U.S. ex rel. Luther v. Consolidated Industries,* 720 F.Supp. 919, 923 (N.D.Ala.1989). Second, in that the Court's August 22, 1994 Order specifically considered McGillivray's arguments concerning subject matter jurisdiction, personal jurisdiction and venue, the Court does not deem it necessary to re-examine these issues here; therefore, all of McGillivray's numerous post-trial motions concerning such are hereby denied without further comment. Third, McGillivray's motion for reconsideration of the Court's denial of McGillivray's motion in limine, filed on March 3, 1995, is denied for the reasons set forth in the record during the pre-trial hearing. Fourth, McGillivray's motion for a mistrial is denied for the reason that after reviewing the trial transcript, the Court concludes that McGillivray, contrary to his belief, was in no way unfairly prejudiced by any of the Court's rulings during trial. Fifth, McGillivray's motion for a ruling on "four questions" is denied as moot.